1

2 .

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11  SAMUEL ANDERSON,                            No.  2:  12-cv-0261 MCE KJN P

12              Plaintiff,

13       v.                                      FINDINGS AND RECOMMENDATIONS

14  MATTHEW TATE, et al.,

15              Defendants.

16

17  Introduction

18       Plaintiff is a state prisoner, proceeding through counsel, with a civil rights action pursuant

19  to 42 U.S.C. § 1983.  Plaintiff alleges that he received inadequate medical care in violation of the

20  Eighth Amendment.  Pending before the court is defendants' summary judgment motion filed

21  February 14, 2014, on behalf of defendants Swingle, Lee, Pomazal, Royston, Cummings and

22  Stovall.  (ECF 162.)  Defendants argue that they are entitled to qualified immunity.

23       On April 24, 2014, a hearing was held before the undersigned regarding defendants'

24  summary judgment motion.  Chijioke Ikonte appeared on behalf of plaintiff.  Scott Foley

25  appeared on behalf of defendants.  After carefully reviewing the record, the undersigned

26  recommends that defendants' motion be granted in part and denied in part.

27  ////

28  ////

                                              1

1  Preliminary Matters

2         *Parties*

3         Pursuant to Federal Rule of Civil Procedure 25, on January 10, 2014, defendants filed a

4  notice that defendant Pearsall has died.  (ECF No. 159.)  At the April 24, 2014 hearing, plaintiff's

5  counsel stated that he does not oppose the dismissal of defendant Pearsall.  Accordingly, the

6  undersigned recommends that defendant Pearsall be dismissed.

7         On September 5, 2012, service as to defendant Hoffman was returned unexecuted.  (ECF

8  No. 82).  At the April 24, 2014 hearing, plaintiff's counsel stated that he does not oppose the

9  dismissal of defendant Hoffman.  Accordingly, the undersigned recommends that defendant

10 Hoffman be dismissed.

11        *Defendants' Reply*

12        On April 23, 2014, i.e., one day before the April 24, 2014 hearing, defendants filed a reply

13 to plaintiff's opposition.  (ECF No. 176.)  Pursuant to Local Rule 230(d), not less than seven days

14 preceding the date of the hearing, the moving party may serve and file a reply to any opposition

15 filed by a responding party.  As discussed at the April 24, 2014 hearing, defendants' reply is

16 stricken as untimely.

17        Although defendants reply is stricken, the undersigned has reviewed the reply and finds

18 that it would not change the analysis of defendants' motion.  The undersigned also observes that

19 in the reply, defendants object to the declaration of plaintiff's expert on the grounds that the

20 expert was not timely disclosed.  However, defendants did not bring a motion to strike the

21 declaration.  The undersigned has considered the declaration in evaluating defendants' motion

22 because defendants did not bring a timely motion to strike.  Defendants may bring a motion in

23 limine addressing plaintiff's expert at the appropriate time.

24        In the reply, defendants also object to several of plaintiff's exhibits on the grounds that

25 they are not properly authenticated.  The undersigned has considered the exhibits because

26 defendants' objection to their authentication is not timely.  At trial, plaintiff's counsel will be

27 required to properly authenticate his exhibits.

28 ////

1  Summary Judgment Standard

2      Summary judgment is appropriate when it is demonstrated that the standard set forth in

3  Federal Rule of Civil Procedure 56 is met. "The court shall grant summary judgment if the

4  movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

5  judgment as a matter of law." Fed. R. Civ. P. 56(a).

6      Under summary judgment practice, the moving party always bears the initial

7  responsibility of informing the district court of the basis for its motion, and identifying those

8  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

9  together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

10  of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed.

11  R. Civ. P. 56(c).) "Where the nonmoving party bears the burden of proof at trial, the moving

12  party need only prove that there is an absence of evidence to support the non-moving party's

13  case." Nursing Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.),

14  627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp., 477 U.S. at 325); see also Fed. R. Civ. P.

15  56 Advisory Committee Notes to 2010 Amendments (recognizing that "a party who does not

16  have the trial burden of production may rely on a showing that a party who does have the trial

17  burden cannot produce admissible evidence to carry its burden as to the fact"). Indeed, summary

18  judgment should be entered, after adequate time for discovery and upon motion, against a party

19  who fails to make a showing sufficient to establish the existence of an element essential to that

20  party's case, and on which that party will bear the burden of proof at trial. Celotex Corp., 477

21  U.S. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving

22  party's case necessarily renders all other facts immaterial." Id. at 323.

23      Consequently, if the moving party meets its initial responsibility, the burden then shifts to

24  the opposing party to establish that a genuine issue as to any material fact actually exists. See

25  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to

26  establish the existence of such a factual dispute, the opposing party may not rely upon the

27  allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

28  form of affidavits, and/or admissible discovery material in support of its contention that such a

3

1    dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party

2    must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome

3    of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

4    (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir.

5    1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return

6    a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

7    (9th Cir. 1987).

8         In the endeavor to establish the existence of a factual dispute, the opposing party need not

9    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

10   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

11   trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

12   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

13   Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

14   amendments).

15        In resolving a summary judgment motion, the court examines the pleadings, depositions,

16   answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

17   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

18   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

19   drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences

20   are not drawn out of the air, and it is the opposing party's obligation to produce a factual

21   predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F.

22   Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to

23   demonstrate a genuine issue, the opposing party "must do more than simply show that there is

24   some metaphysical doubt as to the material facts. . . .  Where the record taken

25   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

26   'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

27   ////

28   ////

4

1    Plaintiff's Claims

2         This action is proceeding on the second amended complaint (ECF No. 40).  Defendants

3    move for summary judgment as to the following claims:  1) defendants Swingle and Lee failed to

4    respond to plaintiff's complaints regarding inadequate pain medication (id. at 3-6); 2) defendants

5    Stovall and Cummings improperly discontinued plaintiff's Remeron (id. at 17); 3) defendant

6    Royston improperly prescribed medication for plaintiff that contained aspirin  (id. at 18); and 4)

7    defendant Pomazal refused to treat a staph infection on plaintiff's head (id. at 18.)

8         In his opposition to defendants' motion, plaintiff concedes that defendant Cummings did

9    not violate his Eighth Amendment rights and should be granted summary judgment.

10   Accordingly, based on plaintiff's non-opposition, the undersigned herein recommends that

11   defendant Cummings be granted summary judgment.

12   Legal Standard for Eighth Amendment Claims

13        To succeed on an Eighth Amendment claim predicated on the denial of medical care, a

14   plaintiff must establish that he had a serious medical need and that the defendant's response to

15   that need was deliberately indifferent.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see

16   also Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A serious medical need exists if the failure to

17   treat the condition could result in further significant injury or the unnecessary and wanton

18   infliction of pain.  Jett, 439 F.3d at 1096.  Deliberate indifference may be shown by the denial,

19   delay or intentional interference with medical treatment or by the way in which medical care is

20   provided.  Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988).  To act with deliberate

21   indifference, a prison official must both be aware of facts from which the inference could be

22   drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Farmer

23   v. Brennan, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if he knows that plaintiff faces

24   "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures

25   to abate it."  Id. at 847.  "[I]t is enough that the official acted or failed to act despite his

26   knowledge of a substantial risk of serious harm."  Id. at 842.

27        A physician need not fail to treat an inmate altogether in order to violate that inmate's

28   Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A

1  failure to competently treat a serious medical condition, even if some treatment is prescribed, may

2  constitute deliberate indifference in a particular case.  Id.

3      It is well established that mere differences of opinion concerning the appropriate treatment

4  cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332

5  (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

6  Legal Standard for Qualified Immunity

7      In analyzing a claim of qualified immunity, a court must examine (1) whether the facts as

8  alleged, taken in the light most favorable to plaintiff, show that the defendant's conduct violated a

9  constitutional right, and (2) if a constitutional right was violated, whether, "in light of the specific

10  context of the case," the constitutional right was so clearly established that a reasonable official

11  would understand that what he or she was doing violated that right.  See Saucier, 533 U.S. at

12  201–02.  If no constitutional right was violated, the inquiry ends and the defendant prevails.

13  Saucier, 533 U.S. at 201.

14      To meet the "clearly established" requirement, "[t]he contours of the right must be

15  sufficiently clear that a reasonable official would understand that what he is doing violates that

16  right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This requires defining the right

17  allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  Id.

18  "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

19  reasonableness is judged against the backdrop of the law at the time of the conduct."  Brosseau v.

20  Haugen, 543 U.S. 194, 198 (2004).

21      Courts are not required to address the two inquiries in any particular order.  Rather, courts

22  may "exercise their sound discretion in deciding which of the two prongs of the qualified

23  immunity analysis should be addressed first in light of the circumstances in the particular case at

24  hand."  Pearson v. Callahan, 555 U.S. 223, 243 (2009).

25  Claim Against Defendants Swingle and Lee

26      Plaintiff alleges that defendants Swingle and Lee did not provide him with adequate pain

27  medication for chronic pain.  In his opposition, plaintiff argues that defendant Pomazal is also

28  liable for his alleged failure to receive adequate pain medication.  However, the court did not

6

1   order service of defendant Pomazal as to this claim.  (See screening order; ECF No. 50 at 1.)

2   Accordingly, the undersigned disregards plaintiff's arguments in his opposition regarding

3   defendant Pomazal's alleged failure to provide him with adequate pain medication.

4          The following facts regarding this claim are undisputed.

5          *Undisputed Facts*

6          At all relevant times during this lawsuit, plaintiff was housed at High Desert State Prison

7   ("HDSP").  During this time period, plaintiff complained of chronic back pain and nerve pain.

8   Plaintiff was diagnosed with scoliosis, degenerative joint disease (osteoarthritis), and leg pain that

9   may have arisen from neuropathy associated with diabetes.

10          Plaintiff was prescribed morphine for his lower back pain while at HDSP.  While

11   defendants claim that plaintiff received morphine as early as December 2010, plaintiff has

12   provided medical records indicating that he was prescribed morphine beginning in April 2010.

13   (ECF No. 168 at 9, 13-14, 16-17.)

14          In March 2011, plaintiff's morphine dosage was gradually decreased and eventually

15   discontinued.  (Id. at 23.)  In March 2011, plaintiff began receiving Tramadol, 50 mg. twice daily.

16   (Id. at 22.)  Plaintiff received Tramadol until on or around February 2012.

17          Plaintiff was prescribed oxcarbazepine for neuropathic pain beginning in June 2011.

18          On October 21, 2011, defendant Pomazal referred plaintiff to the pain management

19   committee.  On November 8, 2011, the pain management committee referred plaintiff to a

20   specialist for pain testing to assess plaintiff's need for pain medication and whether he would

21   benefit from physical therapy.

22          On February 3, 2012, Physician's Assistant Robertson informed plaintiff that the pain

23   management committee's decision was to offer him alternatives to Tramadol, but plaintiff refused

24   the alternatives.

25          On February 17, 2012, plaintiff met with a physician's assistant to discuss his complaints

26   of pain in his back, feet and legs.  Plaintiff was informed that he would have to wait for the pain

27   management committee to review his case at its February 28, 2012 meeting.

28   ////

1    On February 28, 2012, the pain management committee noted that plaintiff was taking

2    oxcarbazepine to control his nerve pain and recommended to not renew plaintiff's Tramadol

3    prescription, but did recommend offering plaintiff Tylenol, physical therapy and non-opiod

4    medications.  Defendant Lee signed the recommendation of the pain management committee.

5    *Evidence Regarding Standard of Care*

6    Regarding the standard of care for chronic pain, defendants have submitted the

7    declaration of Dr. Barnett.  According to Dr. Barnett, scoliosis is not by itself a sufficient basis for

8    pain so severe as to require narcotics such as morphine or Tramadol.  (ECF No. 162-4 at 4.)

9    According to Dr. Barnett, scoliosis rarely causes such pain.  (Id.)  Dr. Barnett states that mild to

10   moderate degenerative joint disease also does not merit the use of narcotics.  (Id.)  Dr. Barnett

11   state that the use of narcotics for leg pain associated with neuropathy is disfavored.  (Id.)

12   Dr. Barnett states that the standard of care for mild to moderate degenerative joint diseases

13   is an exercise program of non-impact activities.  (Id.)  The second line of treatment would be

14   cautious administration of anti-inflammatory medications, non-narcotic medications like Tylenol,

15   weight loss and gentle stretching and exercise.  (Id.)

16   Dr. Barnett states that the first step in treating diabetic neuopathies is to bring the blood

17   glucose levels within the normal range to help prevent further nerve damage.  (Id.)  If the patient

18   experiences painful diabetic neuropathy, a physician may prescribe oral medications including

19   tricyclic antidepressants, other types of antidepressants, anticonvulsants and opiods.  (Id.)

20   Dr. Barnett states that in the many exams documented in plaintiff's medical records,

21   including consultations with experts in neurology, cardiology, and general surgery, there are no

22   reports of any severe pain or findings of anatomic or physiologic dysfunction that would be

23   expected to cause such severe pain as to require narcotics.  (Id.)  The ongoing use of Tramadol,

24   morphine and Lyrica would have been improper in plaintiff absent a reasonable trial of alternative

25   therapies.  (Id. at 5-6.)

26   Plaintiff has provided the declaration of his own expert, Dr. Frank, who states that the

27   standard of care for the management of chronic pain is to find the best combinations of

28   medications in the best doses to adequately control pain without causing unacceptable side

1    effects.  (ECF No. 170 at 4.)  This approach usually requires starting medications at low doses,

2    titrating upwards until adequate pain is control is achieved, thereafter continuing the dose that

3    was used to achieve adequate control.  (Id.)  In this way, pain may be controlled over long periods

4    of time.  (Id.)  Periodic dosing adjustments are usually necessary to minimize or avoid addiction

5    or ineffectiveness of the medication in managing the pain.  (Id.)  Simultaneous use of multiple

6    medications from different classes including opiods is the rule, not the exception.  (Id.)

7         Dr. Frank states that while a mild to moderate degenerative joint disease may be treated

8    with an exercise program such as swimming, cycling and walking, it has not been proven that

9    physical therapy can help adults with severe S-shaped thoracolumbar scoliosis.  (Id.)

10        Dr. Frank observes that in this case, the pain that plaintiff experienced was minimized or

11   ignored based upon faulty assumptions by treating physicians.  (Id.)  Instead of titrating upwards

12   when his very low dose was ineffective, the treating physicians discontinued plaintiff's effective

13   pain medication.  (Id. at 4-5.)  For instance, the treating physicians switched from low dose time-

14   released morphine to Tramadol.  (Id. at 5.)  Tramadol is a narcotic-like pain reliever used to treat

15   moderate to severe pain.  (Id.)  Unlike morphine-sulfate, Tramadol is not an opiate and is not

16   classified as such.  (Id.)  When a low dose of Tramadol was ineffective in controlling plaintiff's

17   pain, the physician's discontinued the medication altogether.  (Id.)

18        Dr. Frank also states that scoliosis is a source of plaintiff's pain.  (Id. at 4.)  While

19   scoliosis may not be a source of pain for children and adolescents, the same is not true for 60 year

20   old adults.  (Id.)  Scoliosis in adults often results in chronic intractable pain due to weight bearing

21   on a severely deformed frame.  (Id.)  Dr. Frank states that plaintiff's diabetic neuropathy and

22   degenerative joint disease are also a source of plaintiff's chronic pain.  (Id.)

23        *Analysis*

24        At the outset, the undersigned finds that plaintiff is raising two claims regarding the

25   alleged denial of pain medication.  Plaintiff challenges the March 2011 decision to substitute

26   Tramadol for morphine.[1]  Plaintiff also challenges the February 2012 decision to discontinue

27   _____

28   [1]  In his declaration submitted in support of the opposition, plaintiff states that the morphine was
     effective in managing his pain.  (ECF No. 169 at 2.)  Plaintiff states that Tramadol provided

1   Tramadol.  In their summary judgment motion, defendants argue that plaintiff did not require

2   treatment with any narcotics, i.e. morphine or Tramadol, for pain.  Defendants do not address

3   whether Tramadol was properly substituted for morphine.  Accordingly, the undersigned will not

4   address that issue herein.

5          Turning to merits of defendants' motion, the undersigned observes that neither party has

6   identified what particular medical problem the morphine and Tramadol were prescribed to treat.

7   Surely plaintiff's medical records contain some notation regarding this issue.  Despite this

8   omission, the undersigned may evaluate the merits of defendants' motion.  For the following

9   reasons, defendants should be denied summary judgment as to plaintiff's claim that he was not

10  provided adequate pain medication.

11         Whether plaintiff's pain required treatment with narcotics, such as morphine and/or

12  Tramadol, is disputed.  While Dr. Barnettt states that there are no reports in plaintiff's medical

13  record of any severe pain or findings of anatomic or physiologic dysfunction that would be

14  expected to cause such severe pain as to require narcotics, he also states that plaintiff did not

15  begin taking morphine until December 2010.  Plaintiff has presented medical records indicating

16  that he was prescribed morphine beginning in April 2010.  Therefore, some medical professional

17  had previously determined that morphine was an appropriate prescription for plaintiff, and Dr.

18  Barnett's opinion regarding plaintiff's need for narcotics, including whether alternative therapies

19  were first tried, does not appear to be based on a review of all of plaintiff's relevant medical

20  records.

21         Plaintiff has submitted a medical report from Dr. Windsor at HDSP dated June 18, 2018,

22  in which she prescribed Tramadol for plaintiff's pain.  (ECF No. 168 at 54-55.)  This prescription

23  for Tramadol appears to have been in response to the court's May 25, 2012 order (ECF No. 48)

24  directing defendants to respond to plaintiff's request for injunctive relief in which he sought

25  adequate pain medication.  In response, defendants provided the declaration of defendant Swingle

26  who stated,

27

28  limited relief from pain.  (Id. at 3.)

2.  I reviewed Samuel Anderson's medical file on June 4 and 5, 2012.  After reviewing the file, I arranged for Mr. Anderson to meet with his primary care provider on June 8, 2012.  The purpose of the meeting was to specifically assess Mr. Anderson's pain and to decide on a course of action to manage his pain.

3.  Dr. Windsor is Mr. Anderson's current primary care provider.  She evaluated him on June 8, 2012.   She determined that Mr. Anderson does in fact suffer from pain and recommended prescribing Tramadol.  No other pain medication was recommended by Dr. Windsor.

4.  I approved Dr. Windsor's recommendation of prescribing Mr. Anderson Tramadol, which is a non-formulary drug, as part of his pain treatment plan.  Mr. Anderson will be given 50 mg per day for 30 days.  He will be able to refill his Tramadol prescription 11 times, so it will last one full year.

5.  Mr. Anderson has been scheduled to be seen by his primary care provider within 30 days of his June 8 evaluation.   During this follow-up visit, the primary care provider will determine whether the Tramadol has been effective and determine what, if any, other pain management tools will be necessary or appropriate.

6.   Mr. Anderson is in pain.   Tramadol is the recommended treatment and is appropriate.   Morphine and Lyrica are not appropriate at this time.  Mr. Anderson's pain will again be evaluated in a follow-up visit with his primary care provider and she will determine whether additional pain medication is necessary at that time.

7.  Pain treatment is a process that often requires adjustments to be effective.  Mr. Anderson has been on different combinations of pain medications to treat his pain throughout the years of his custody, and will likely have new or different combinations in the future.  It was inappropriate for the pain management committee to discontinue Mr. Anderson's Tramadol on February 28, 2012.  However, it is again appropriate at this time to prescribe Mr. Anderson Tramadol for the pain he is currently experiencing.

(ECF No. 58-1 at 1-2.)

In the declaration quoted above, defendant Swingle states that plaintiff had pain that should be treated with Tramadol.

Plaintiff has also presented evidence that when he was transferred to California State Prison-Lancaster ("Lancaster") in August 2012, he was prescribed methadone for pain.  (ECF No. 169 at 4; ECF No. 168 at 57.)

Methadone is used to relieve moderate to severe pain that has not been relieved by non-narcotic pain relievers. It also is used to prevent withdrawal symptoms in patients who were addicted to

11

1
2

> opiate drugs and are enrolled in treatment programs in order to stop
> taking or continue not taking the drugs. Methadone is in a class of
> medications called opiate (narcotic) analgesics.

3      http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html

4             The record demonstrates that doctors at both HDSP and Lancaster prescribed narcotics to

5      treat plaintiff's pain, i.e. morphine, Tramadol and methadone.  Based on these circumstances,

6      including Dr. Barnett's apparent failure to review all of plaintiff's relevant medical records, the

7      undersigned finds that whether plaintiff required morphine and/or Tramadol for pain is a disputed

8      material fact.  Based on this record, the undersigned cannot find that Dr. Barnett's opinion that

9      plaintiff did not require narcotics constitutes a mere difference of opinion with the doctors who

10     prescribed Tramadol, morphine and methadone.

11            The undersigned also observes that both Dr. Frank and Dr. Barnett appear to agree that

12     the standard of care for pain management is to begin with conservative treatment and then

13     increase treatment if necessary.  The record demonstrates that defendants did not follow this

14     standard of care with plaintiff.  Instead, plaintiff was given morphine, then Tramadol and then

15     offered Tylenol.  In other words, defendants began with the strongest treatment, which proved

16     effective, then discontinued it.  Without a better explanation for why defendants did not follow

17     the standard of care, they cannot be granted summary judgment as to this claim.

18            Based on the discussion above, the undersigned finds that, taking the facts in the light

19     most favorable to plaintiff, the February 2012 decision to discontinue all narcotics, including

20     morphine and Tramadol, violated plaintiff's Eighth Amendment rights.

21            Turning to the second prong of the qualified immunity analysis, the undersigned finds that

22     the discontinuation of all narcotics in February 2012 arguably violated plaintiff's Eighth

23     Amendment rights.  Based on the record discussed above, the undersigned finds that a reasonable

24     prison official would have known that discontinuing all narcotics, and thereby causing plaintiff

25     pain, violated the Eighth Amendment.

26            For the reasons discussed above, defendants Swingle and Lee should be denied summary

27     judgment as to this claim.

28     ////

Claim Against Defendant Stovall

Plaintiff alleges that defendant Stovall violated his Eighth Amendment right to adequate medical care when he discontinued plaintiff's Remeron.

*Undisputed Facts*

Defendant Stovall is a licensed clinical social worker with eighty to one hundred inmates assigned to him at any given time. By law, and by prison policy, a licensed clinical social worker is not allowed to prescribe or discontinue a patient's medications. Psychotropic medications, such as antidepressants, can only be prescribed or discontinued by a psychiatrist or another medical doctor under limited circumstances.

Defendant Stovall was plaintiff's psyche case manager at HDSP. Plaintiff had the ability to contact defendant Stovall by filling out a healthcare request form, checking the "Mental Health" box at the top of the form, and submitting the form to the prison's Mental Health Office. Plaintiff also had the ability to contact defendant Stovall or other mental health staff by submitting an Inmate Request for Interview form.

Plaintiff had Remeron prescribed to him at HDSP. Remeron is a tetracyclic antidepressant that has been approved by the Food and Drug Administration ("FDA") for the treatment of depression. Plaintiff took 60 mg of Remeron each day from October 1, 2011 through December 25, 2011, with the exception of December 1, 2011.

Citalopram is an antidepressant that has been approved by the FDA for the treatment of depression. Plaintiff took 60 mg of citalopram each day from October 1, 2011, through October 12, 2011, and from November 1, 2011, through February 29, 2012, with the exception of December 1, 2011.

Defendant Stovall met with plaintiff on November 10, 2011, and December 7, 2011, in response to two separate requests for interviews submitted by plaintiff wherein he asked to see his psyche case manager. On December 14, 2011, plaintiff had an appointment with Dr. Lofthouse, a psychiatrist. Plaintiff did not attend his December 14, 2011 appointment with Dr. Lofthouse because plaintiff was at the Correctional Treatment Center for a medical issue.

////

13

1    Office technicians in the mental health office at HDSP are assigned to monitor when an

2  inmate's prescriptions are set to expire, and they have the responsibility to schedule inmates'

3  appointments with a psychiatrist so that the psychiatrist can determine whether to extend the

4  prescription before it expires.

5    If an inmate does not show up for an appointment or it gets cancelled, an office technician

6  in the mental health office is responsible for rescheduling the appointment after being notified of

7  the no-show or cancellation.

8    Defendant Stovall met with plaintiff on December 20, 2011, for a routine visit.  Plaintiff's

9  prescription for Remeron expired on December 25, 2011.

10    If a patient has been taking Remeron for an extended period of time and stops taking it

11  without gradually diminishing the dosage (cold turkey), there is a possibility that the patient will

12  experience adverse reactions such as dizziness, headache, fatigue, anxiety, agitation,

13  aggression/irritability, nausea, and vomiting.  Adverse reactions, or discontinuation symptoms,

14  typically disappear about two days after a patient stops taking an antidepressant cold turkey.

15  Discontinuation symptoms will resolve spontaneously within one or two weeks after onset.

16  Discontinuation symptoms will resolve within twenty-four hours after a patient takes a dose of

17  the previously discontinued antidepressant.

18    If a patient has been taking Remeron and citalopram for an extended period of time and

19  stops taking Remeron cold turkey but continues to take citalopram, the citalopram should provide

20  sufficient coverage to treat the patient's depression and, if so, the patient will not be expected to

21  experience the discontinuation symptoms associated with discontinuing Remeron.

22    On January 3, 2012, defendant Stovall met with plaintiff in response to a medial chrono

23  that indicated that plaintiff refused to comply with the procedures for administration of

24  psychiatric medications for three consecutive days.  On January 3, 2012, plaintiff maintained

25  good eye contact with defendant Stovall and did not exhibit any unusual behavior.  On January 3,

26  2012, defendant Stovall informed plaintiff that he had an appointment with Dr. Lofthouse

27  scheduled for January 11, 2012.

28  ////

1    Plaintiff felt agitated and could not sleep after his Remeron prescription was discontinued.

2    Plaintiff told the officers in his housing unit that he felt agitated and could not sleep after his

3    Remeron prescription was discontinued.

4    On January 10, 2012, the mental health department received an Inmate Request for

5    Interview from Plaintiff dated January 1, 2012, wherein plaintiff asked to see his psyche case

6    manager, defendant Stovall.  The reason plaintiff gave for requesting an interview on January 1,

7    2012, was that someone had discontinued his Remeron prescription which made his sleeping

8    problems a lot worse.

9    On January 11, 2012, plaintiff was able to attend his appointment with Dr. Lofthouse as

10   scheduled.  On January 11, 2012, plaintiff told Dr. Lofthouse that he was upset that his Remeron

11   was no longer being given to him.  On January 11, 2012, Dr. Lofthouse noted that plaintiff was

12   tired and his sleeping seemed to be impaired and concluded that plaintiff appeared to have

13   become more depressed after his Remeron expired, but noted that plaintiff's thinking was

14   relevant and goal oriented.  On January 11, 2012, Dr. Lofthouse renewed plaintiff's Remeron

15   prescription.

16   *Analysis*

17   Defendants concede that there is a genuine factual dispute as to whether suffering adverse

18   effects after the expiration of a psychotropic medication constitutes a serious medical need.

19   Defendants argue that defendant Stovall is entitled to summary judgment as to this claim because

20   he was not aware that plaintiff's Remeron prescription had expired.  Defendants also argue that

21   plaintiff did not suffer any harm after the Remeron prescription expired.

22   Whether defendant Stovall knew that plaintiff's Remerol prescription expired is a

23   materially disputed material fact.  In his declaration submitted in support of the summary

24   judgment motion, defendant Stovall states that he was not aware that plaintiff's Remeron

25   prescription expired on December 25, 2011.  (ECF No. 162-11 at 3.)

26   In his declaration, defendant Stovall indicates that plaintiff did not tell him that his

27   Remeron prescription expired when they met on January 3, 2012.  (Id.)  He met with plaintiff in

28   response to a medical chrono indicating that plaintiff had refused to comply with procedures for

15

the administration of medication for three consecutive days.  (Id.)  The purpose of the visit was to

find out why plaintiff had not complied with medication procedures.  (Id.)  Defendant Stovall

states that had he known that plaintiff's Remeron prescription expired, he would have obtained a

bridging order from a psychiatrist that would have given plaintiff Remeron until his January 11,

2012 appointment. (Id.)  A bridging order is designed to provide an inmate with his expired

medication until he can have an appointment with a psychiatrist to determine whether the

prescription should be extended.  (Id. at 3-4.)

        In his declaration submitted in support of the opposition, plaintiff states that on December

20, 2011, and January 3, 2012, he and defendant Stovall discussed the expiration of his Remeron

prescription:

> 31.  On December 25, 2011, my prescription for Remeron expired.
> I discussed the medications that I take with my case worker, Mr.
> Stovall, including when the prescriptions expires, purpose of the
> medication, administration of the medication and any concerns that
> I may have.  Indeed, during our meeting on December 20, 2011, we
> discussed the medications that I was taking, the efficacy of the
> medication on my symptoms as well as when the medications were
> due to be refilled.  Mr Stovall was aware that my prescription for
> Remeron would expire on December 25, 2011.
>
> 32.   After I stopped taking Remeron on December 25, 2011, I
> experienced aggression and became easily irritated.  I was unable to
> sleep, was almost always in physical distress, easily tired and in a
> dysphoric mood.
>
> 33.  When I consulted with Dr. Lofthouse on January 11, 2012, I
> discussed the physical symptoms that I was feeling after the
> withdrawal of Remeron with him.
>
> 34.  My symptoms from withdrawal of Remeron resolved shortly
> after I started the Remeron following my visit with Dr. Lofthouse
> on January 11, 2012.
>
> 35.  On January 3, 2012, I discussed some of my symptoms from
> the withdrawal of Remeron that I was experiencing with Stovall.

(ECF No. 169 at 5-6.)

        Turning to the qualified immunity analysis, taking the facts in the light most favorable to

plaintiff, the undersigned finds that plaintiff and defendant Stovall discussed the December 25,

2011 expiration of his Remeron prescription on December 21, 2011, and January 3, 2012.  While

it was not defendant Stovall's responsibility to monitor the expiration of plaintiff's medication

16

1   and schedule appointments with psychiatrists for refills, he had the authority to obtain bridging

2   orders.  Because plaintiff did not have an appointment with Dr. Lofthouse until January 11, 2012,

3   defendant Stovall could have obtained a bridging order on December 21, 2011, or January 3,

4   2012.  Taking the facts in the light most favorable to plaintiff, the undersigned finds that

5   defendant Stovall's failure to obtain a bridging order violated plaintiff's Eighth Amendment

6   rights.  The undersigned further finds that a reasonable officer would have known that failing to

7   help plaintiff obtain a refill of the Remeron with a bridging order violated the Eighth

8   Amendment.

9         While defendants argue that plaintiff did not suffer any harm after the Remeron expired, it

10   is undisputed that on January 11, 2012, Dr. Lofthouse noted that plaintiff was tired and his

11   sleeping seemed to be impaired and concluded that plaintiff appeared to have become more

12   depressed after his Remeron expired.  Because it is undisputed that Dr. Lofthouse found that

13   plaintiff suffered harm as a result of the discontinuation of his Remeron, i.e. unable to sleep and

14   more depressed, the undersigned need not further address defendants' argument that plaintiff

15   suffered no harm.

16         For the reasons discussed above, the undersigned recommends that defendant Stovall be

17   denied summary judgment.

18   Claims Against Defendant Royston

19         Plaintiff alleges that defendant Royston acted with deliberate indifference to his serious

20   medical needs when he prescribed a medication containing aspirin, to which plaintiff is allergic.

21         *Undisputed Facts*

22         Someone who is allergic to aspirin may experience a rash, swelling of the face, lips,

23   tongue or throat, difficulty breathing, shortness of breath, or anaphylaxis very soon after taking

24   the medication.  Stomach upset or stomach pain is not an allergic reaction, but a potential and

25   common side effect of taking aspirin and other nonsteroidal anti-inflammatory drugs.  Patients

26   who report stomach discomfort, stomach distress, heartburn or other signs of sensitivity to

27   NSAIDS are not barred from the use of other NSAIDS.

28   ////

17

1    NSAIDS should not be prescribed to someone with a chronic or recent history of stomach

2    ulcers.

3        If plaintiff takes aspirin, it causes him to experience stomach pain.

4        On December 30, 2011, defendant Royston met with plaintiff because plaintiff was

5    complaining of a rash, neck pain and low back pain.  On December 30, 2011, defendant Royston

6    prescribed plaintiff salsalate, which is an NSAID.

7        On January 4, 2012, plaintiff complained that the salsalate was making his "stomach turn

8    flips."  On January 5, 2012, plaintiff complained that the salsalate was causing him to have a

9    stomach ache, so nurses took the medication away from him that day.

10       *Analysis*

11       Defendants move for summary judgment as to this claim on grounds that plaintiff was not

12   allergic to aspirin.  Defendants argue that while plaintiff had a sensitivity to aspirin, that did not

13   preclude him from taking other NSAIDS such as salsalate.

14       In his opposition, citing his deposition testimony, plaintiff argues that he has suffered

15   allergic reactions to aspirin including difficulty breathing, swelling, itchy skin, shortness of breath

16   and coughing.  Citing his deposition testimony, plaintiff also argues that he has been diagnosed

17   with a stomach ulcer.  However, the transcript from plaintiff's deposition indicates that plaintiff

18   testified that the only side effect he has from taking aspirin is stomach pain.  (Plaintiff's

19   deposition at 10.)  Plaintiff testified that taking aspirin did not give him itchy skin, swelling,

20   shortness of breath or difficulty breathing.  (Id. at 10-11.)  Plaintiff also testified that he has not

21   been diagnosed with a stomach ulcer.  (Id. at 15.)

22       Plaintiff also cites two exhibits attached to his opposition which allegedly reflect a

23   documented allergy to NSAIDS.  Plaintiff cites an undated medical record stating that he is "not a

24   candidate for NSAIDS."  (ECF No. 168 at 6.)  This record contains another note regarding

25   NSAIDS, but it is not legible.  (Id.)  Plaintiff cites a record from Banner Health listing his aspirin

26   as a known allergy.  (Id. at 41.)  Based on plaintiff's deposition testimony, the undersigned

27   suspects that these medical records stating that plaintiff is allergic to NSAIDS are most likely

28   based on plaintiff's self-reporting.

18

1     At the outset, the undersigned finds that the record contains no credible evidence that

2   plaintiff is allergic to aspirin.  Plaintiff's deposition testimony, as well as his reaction to the

3   salsalate, indicate that plaintiff had a sensitivity to aspirin, but not an actual allergy. The

4   undersigned also finds that there is no evidence that defendant Royston acted with deliberate

5   indifference.  The record before the undersigned contains no evidence that plaintiff's medical

6   record reviewed by defendant Royston contained a clear notation that plaintiff was sensitive to

7   aspirin.  Therefore, assuming that an aspirin sensitivity meets the objective component of the

8   Eighth Amendment, there is no evidence of the subjective component, i.e., that defendant

9   Royston disregarded a serious medical need.  For these reasons, defendant Royston should be

10   granted summary judgment.

11   Claims Against Defendant Pomazal

12     Plaintiff alleges that defendant Pomazal failed to treat a staph infection on his head.

13   Defendants move for summary judgment as to this claim.  Plaintiff's opposition does not address

14   this argument.  At the April 24, 2014 hearing, plaintiff's counsel states that he does not oppose

15   defendants' motion for summary judgment as to this claim against defendant Pomazal.

16   Accordingly, based on plaintiff's non-opposition, the undersigned recommends that defendant

17   Pomazal be granted summary judgment.

18     Accordingly, IT IS HEREBY RECOMMENDED that:

19     1.  Defendants Hoffman and Pearsall be dismissed;

20     2.  Defendants' summary judgment motion (ECF No. 162) be granted as to defendants

21       Pomazal, Cummings and Royston; and

22     3.  Defendants' summary judgment motion (ECF No. 162) be denied as to defendants

23       Swingle, Lee and Stovall.

24     These findings and recommendations are submitted to the United States District Judge

25   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

26   after being served with these findings and recommendations, any party may file written

27   objections with the court and serve a copy on all parties.  Such a document should be captioned

28   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

1   objections shall be filed and served within fourteen days after service of the objections.  The

2   parties are advised that failure to file objections within the specified time may waive the right to

3   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

4   Dated:  May 12, 2014

5

6   An261.sj

KENDALL J. NEWMAN
UNITED STATES MAGISTRATE JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28